WILLIAM R. Ross, petitioner,

*v.*

ELEANOR ROSS.

[Decided July 10th, 1918.]

The evidence in this case—*Held*, to warrant a decree of divorce on the ground of the wife's adultery.

On petition for divorce.

*Messrs. Queen & Stout,* for the petitioner.

*Mr. J. Emil Walscheid,* for the defendant.

LEWIS, V. C.

The petitioner in this case has presented evidence that convinces me that he is entitled to a decree for divorce against his wife.

The parties were married on February 27th, 1907. He was a motorman and she was employed as a domestic. Their residence was in Brooklyn until the summer of 1907, when the peti-

tioner came to live in this state.  One child, born July 29th,
1908, was the fruit of the union, and at the time of this hear-
ing is being cared for by Mrs. Margaret Ross, an aunt of the
petitioner, all expenses in connection with the same being paid
by the petitioner.  Shortly after the birth of the child, troubles
arose in the household, owing to the use by the defendant of in-
toxicating liquors.  She was arrested at times, and the petitioner
procured her release, but, finally, she was sent to the House of
Good Shepherd in Brooklyn.  From this institution she was also
discharged through the intercession of the petitioner, but she was
again arrested.  Upon her release on this occasion, she brought
suit in Brooklyn against her husband for separate maintenance.
It was then that the petitioner took up his residence in New
Jersey, and they lived apart from August, 1909, to September,
1915.  The petitioner then wrote to his wife asking her to come
to New Jersey, and they met and made arrangements, the result
of which was the taking of an apartment at No. 299 Monmouth
street, Jersey City.  At this address they lived together from
September, 1915, until December, 1915.  The defendant for a
short time abstained from the use of intoxicants and then re-
sumed her habits, which she continued until December 10th, and
on this date the testimony discloses that she set fire to her
apartment and was arrested on a charge of drunkenness.  After
a hearing, she was convicted in the second criminal court of
Jersey City and sentenced to the county jail for ninety days.  A
consideration of the conduct, habits and disposition of the de-
fendant leads one unhesitatingly to the conclusion that her
morals were such that she might commit the offence charged
against her under the circumstances as related by the co-
respondent, William Skow.  Her solicitor contended that the
views expressed and the rules laid down in the case of *Letts* v.
*Letts, 79 N. J. Eq. 630,* should be applied, but, as I indicated at
the time, I think the evidence in this case reveals an entirely dif-
ferent situation.  The vulgarity of the story told herein does not
necessarily lead a reasonable person to regard it as entirely im-
probable.  The corespondent stands unimpeached.  There is
nothing before me to indicate that his testimony was not given
in the interests of justice.  His story must be received with great

caution and scanned carefully. This was done, and a searching cross-examination failed to shake it. It has corroboration from other lips, and one observing the corespondent and these witnesses must have been impressed with the fact that they were ingenuous and relating a truthful account of the defendant's relations with Skow. He says that he had intercourse with her on two occasions. These offences were committed on November 28th, 1915, and the second on December 5th, 1915. They took place in a woodshed in the cellar of No. 299 Monmouth street, Jersey City. Skow's evidence as to the first occasion is as follows:

"Q. Will you describe to the court just when it was and where it was and under what circumstances it took place?

"A. Well, I was down chopping wood one Sunday morning and Mrs. Ross came down while I was chopping wood and she asked me for ten cents and I pushed her away and told her not to bother me and then I goes up and goes over to the other woodshed and she comes in after me and she threw her arms around me and she asked me again for ten cents and I said no, and she kept on pleading and wanted me to be sure that I will come down this afternoon, and she lifted up her clothing and I gave her a quarter that afternoon. She came down and she laid on the burlap in the woodshed and I had connections with her."

His evidence relative to the second occasion is as follows:

"Q. Was there any other occasion when you did that?

"A. Then the Sunday following, I was down there again chopping and she came down and she asked me for money and I gave her a half dollar and she came down in the afternoon the same as the first."

Mrs. Christina Skow, the mother of the corespondent, who lived during the events described by her son at the same address as the Ross family, testified that she heard the voices of her son and Mrs. Ross in the cellar. She knew they were down there. Skow says that one of the expressions used by the defendant when in the basement was "come on." His mother says that on one occasion she heard Mrs. Ross, who was down in the basement, use these words. The effort made to prove that it was impossible to hear a voice in the basement from the Skow apartment failed.

After the arrest and conviction of the defendant in the second criminal court of Jersey City, Ross asked Mrs. Skow if she knew anything about his wife and Mrs. Skow told him to ask her son William. Mrs. Skow had previously informed Ross, whose apartments were opposite her's, that his wife was continually in the cellar and that she was with men. Ross talked to Skow, the corespondent, and the latter told him that he had had intercourse with Mrs. Ross. Upon examination he gave as his reason for disclosing to the petitioner his relations with the defendant that he felt it his duty to see Ross right, as his wife was carrying on and had set fire to the house. It was quite apparent that Skow and Ross were unsophisticated. After hearing the corespondent's story, the petitioner went with Skow, the corespondent, and Magnus Peterson to the county jail and confronted his wife there. Peterson, according to the testimony, appears to have accompanied Ross as a friend. A confession as to the commission of the offences is related by the three. Ross' account is as follows:

"Q. Tell the court what you said and what she said and what the others said.

"A. I asked her how much money she got off William Skow, and she at first said 'No;' and I said, 'Yes, you did,' and she said 'No,' and I said, 'Yes you did,' and she said, 'How do you know?' and I said, 'I was told so,' and she said, 'I got 50 cents for one time and a quarter another time;' and I said, 'What did you give him for his money?' and she said 'Nothing,' and I said, 'Yes, you did;' and she said, 'No, I did not;' so I called in William Skow.

"Q. Where was he?

"A. He was sitting out in the little hall, and I called him in, and he stayed back of me, and I asked him if he was lying to me, or who was lying to me, and he said, 'Ross, I am not lying to you;' so finally she said, 'I let Skow have the best of me twice.'

"Q. Who was there at that time?

"A. Mr. Peterson."

Peterson and Skow both corroborate petitioner as to the admission of the defendant when confronted by Skow.

Mrs. Ross denies her intimacy with Skow. She admitted having borrowed money from him, but entered a denial of the story of the offences in the cellar of the Monmouth street home. Of course, this confession could not alone be relied upon to support a decree for divorce, but it gives corroboration to the story related by the corespondent and the other witnesses of the peti-

tioner. Skow, as above stated, appears to be unshaken in his testimony, and, aside from his improper conduct with defendant, there is nothing affecting his character shown; so the situation is not as in *Clare* v. *Clare, 19 N. J. Eq. 37*. The story as told by Skow accords with the defendant's proved habits and character. *Adams* v. *Adams, 17 N. J. Eq. 325*.

I think the requirements for divorce so comprehensively set forth in the case of *Berckmans* v. *Berckmans, 17 N. J. Eq. 453,* are met by the testimony offered in this case.

I shall, in accordance with the views above expressed, advise a decree *nisi* for the petitioner.